## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 20 2016, 8:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven Knecht
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of S.F., Father, and G.F. and S.S., Children,

S.F.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

July 20, 2016

Court of Appeals Case No.
79A04-1512-JT-2339

Appeal from the
Tippecanoe Superior Court

The Honorable
Faith A. Graham, Judge
The Honorable
Tricia L Thompson, Magistrate

Trial Court Cause Nos.
79D03-1504-JT-31
79D03-1504-JT-33

**Kirsch, Judge.**

[1] S.F. ("Father") appeals the juvenile court's order terminating his parental rights to his children G.F. and S.S. (together, "Children"). He raises one issue that we restate as: whether sufficient evidence was presented to support the termination of Father's parental rights.

[2] We affirm.

## Facts and Procedural History

[3] Father and A.S. ("Mother")[1] are the biological parents of two children, son G.F. and daughter S.S. Mother and Father were living together, as a couple, in Illinois when G.F. was born in October 2011, but separated in May 2012 when G.F. was less than a year old. Mother moved to Indiana, and by agreement of the parties, G.F. remained in Illinois and resided with Father. However, G.F. visited Mother in Indiana from time to time, usually residing with Father for a couple of months, visiting with Mother for two or three weeks, then returning to Father. S.S. was born in February 2013; however, at that time, Father was living in Illinois, and he understood, from Mother's representations, that he was not S.S.'s father.[2]

[4] On October 3, 2013, Indiana Department of Child Services ("DCS") received a report that Mother had left her children in the care of a friend who was using

---

[1] Mother's parental rights to both Children were also terminated, but she does not participate in this appeal.

[2] Father did not know that he was S.S.'s father until around June 2014, several months after both Children had been removed from Mother's home.

synthetic cannabinoids, known as Spice. On October 8, 2013, DCS made an unannounced visit to Mother's home; S.S. was at the home, along with G.F., who was in Indiana visiting Mother. The DCS family case manager noted that G.F. had "dried feces on his bottom," a dirty diaper was in a back bedroom on the floor, and Mother needed prompting to properly clean and change G.F.'s diaper. *DCS Ex.* 2. The next day, DCS conducted a hair follicle screen of the children, and S.S., then-eight months old, tested positive for methamphetamine. DCS did not remove Children at that time, but advised Mother to take S.S. to a doctor. Mother failed to follow through. Later in October, G.F. was given a hair screen, due to having nits in his hair. He tested negative for all substances.

[5] In November 2013, DCS filed a petition alleging that S.S. was a Child in Need of Services ("CHINS") and eventually removed S.S. In January 2014, S.S. was adjudicated a CHINS based on the positive test for methamphetamine, Mother's leaving S.S. with inappropriate caregivers, and Mother's testing positive for Spice. At that time, G.F. was living with Father in Illinois. *DCS Ex.* 1 at 63. The juvenile court instructed Father to be vigilant about leaving G.F. in Mother's care and entered its dispositional order regarding S.S. in August 2014.

[6] In February 2014, Mother tested positive for Spice, and on February 14, 2014, DCS removed S.S., G.F., who at the time was visiting Mother in Indiana, as

well as a third child, B.W., who was born February 9, 2014.[3]  On February 18, 2014, DCS filed a CHINS petition as to G.F. and B.W.  *DCS Ex.* 2 at 15.  By agreement of the parties, the juvenile court ordered DCS to investigate out-of-state placement of G.F. with Father via the Interstate Compact on Placement of Children ("ICPC") and ordered DCS to conduct a home study, after which the juvenile court would rule on the issue of G.F.'s placement.  *Father's Ex.* D; *DCS Ex.* 1 at 69.

[7]  In April 2014, the juvenile court held two evidentiary hearings on the CHINS petition regarding G.F. and B.W.  DCS caseworkers expressed concern about Father's ability to parent G.F. because of his criminal history, lack of employment, and inability to drive, which was due to having multiple driving while intoxicated convictions.  Caseworkers also expressed concern over Father's judgment in leaving G.F. with Mother's boyfriend.  Following the fact-finding hearings, the juvenile court issued a CHINS Fact Finding Order and, as is relevant here, adjudicated G.F. as a CHINS, recognizing that Mother had tested positive for Spice and had left the Children with various individuals, and it found:

> Father [] continued to allow [G.F.] to say at Mother's home despite the Court's insistence that Father be very vigilant about Mother's care and supervision of [G.F.].  Further, Father was aware and allowed [Mother's boyfriend] to have contact with [G.F.] after receiving this Court's order that [Mother's boyfriend]

---

[3] B.W. has a different father and is not a party to this appeal.

have no contact with the children until passing all DCS background checks and submitting to clean drug screens.

*DCS Ex.* 1 at 63. The juvenile court also found that Father and Mother were unemployed.

[8] Following a dispositional hearing, the juvenile court entered a CHINS Disposition Order on May 13, 2014, ordering that G.F. remain in foster care. *DCS Ex.* 1 at 58-59. The juvenile court entered a separate Parental Participation Decree, ordering Father to, among other things, submit to random drug screens, participate in semi-supervised visitation, participate in a parenting assessment, and "[p]articipate in ICPC process." *DCS Ex.* 1 at 56. The Parental Participation Decree also included a requirement that Father "[o]bey the law." *Id.* at 55. In May 2014, Father was convicted in Illinois of two counts of misdemeanor theft and one count of resisting a peace officer and placed on probation. *DCS Ex.* 17. Also, sometime during the course of the CHINS proceedings, Father was arrested in Illinois for burglary, and, in September 2014, he pleaded guilty to Class 2 felony burglary. *DCS Ex.* 20 at 13. In November 2014, the juvenile court, having previously taken the matter of Father's visitation under advisement, ordered Father to "commence supervised visitation, at a third party agency in Terre Haute, Indiana as arranged by DCS," which "shall occur" one Saturday every two months. *DCS Ex.* 1 at 35.

[9] An August 2014 Progress Report stated that Father had exercised a visitation with Children in May 2014, and he had indicated in a phone call from jail to the DCS family case manager that he desired to exercise visitation in June

2014, so the family case manager informally planned a date of June 25; however, Father made no contact with the family case manager in June to confirm or arrange the visit. *DCS Ex*. 3 at 37. A November 2014 Progress Report indicated that Father had been arrested twice "during this reporting period" and "was intoxicated both times." *Id.* at 25. Father had not exercised visitation during the same reporting period, and a referral service, Lifeline Youth and Family Service ("Lifeline"), had not been able to reach him. He did not appear for an October 2014 substance abuse appointment with Human Resource Center ("HRC") in Paris, Illinois to complete a mental health assessment that he had started in September. *Id*. at 25-26.

[10] A February 2015 Status Report reflected that Father had not exercised visitation from October 2014 to December 2014, but did exercise supervised visitation with the children on January 9, 2015. The Report also indicated that Father had made progress in completing court-ordered services, having completed the HRC substance abuse assessment and treatment, and he had gained employment, although DCS still had concerns about the condition of his home and "his lack of involvement with the kids up until January 9, 2015." *DCS Ex*. 3 at 7. The Report further addressed the home study conducted on Father's Illinois home:

> An ICPC was [conducted] for [Father] as placement. Due to the conditions of this home, instability, and [his] extensive criminal history, it was recommended that he not be considered for placement at that time. [Father] has since returned to jail since the last hearing. He is out and back on probation, however is awaiting aggravated battery charges.

*Id.* at 6-7. While the Report recognized Father's affectionate relationship with G.F. and noted that he displays "knowledge of how to care for" him, but DCS noted its concerns with Father's ability to prioritize and budget, "as his home has been without water for several months now." *Id.* at 14-15. A May 2015 Status Report indicated that G.F. had been diagnosed with Reactive Attachment Disorder ("RAD") and Post-Traumatic Stress Disorder ("PTSD"). *Id.* at 1-2.

[11] In April 2015, DCS filed petitions to terminate the parent-child relationship of both parents to G.F. and S.S. *Appellant's App*. at 9-16. At the May 19, 2015 permanency hearing, the court changed the permanency plan to termination of parental rights. *DCS Ex*. 1 at 2. The juvenile court conducted a hearing on the termination of parental rights, which began on July 9 and continued to August 13, 2015.[4] Father, incarcerated in Illinois, appeared telephonically, and his counsel appeared in person.

[12] Family therapist Tamika Montgomery testified at the termination hearing, stating that she began working with Children and the foster family in February 2015, but her involvement was primarily with G.F., who had been diagnosed with RAD and PTSD; S.S. was "assessed not to have the same level of need[.]"

---

[1] [4] We note that, meanwhile, in August 2015, Father appealed the juvenile court's determination that G.F. was a CHINS, arguing that there was insufficient evidence to support the adjudication; Father did not challenge the CHINS adjudication as to S.S. Finding that Father's claims were a request to reweigh the evidence, this court affirmed by memorandum decision. *In re G.F.*, No. 79A02-1405-JC-373 (Ind. Ct. App. Jan. 27, 2015).

*Tr.* at 45. Montgomery described that a child with RAD has social inhibitions, does not seek out comfort from primary caregivers, and "may avoid them, approach them, or withdraw from them." *Id.* at 39. Montgomery explained, "It's typically based on care that has been given that . . . lacked emotional support, lacked physical support or physical needs, basic needs." *Id.* One criteria for a RAD diagnosis is that the child "had to have experienced pervasive neglect from caregivers[.]" *Id.* at 40. She also noted that "[o]ne of the other underlying reasons for [RAD] is they have multiple caregivers." *Id.* at 49. This pervasive lack of care translates into a difficulty for the child to bond or attach to adult caregivers. In G.F.'s case, at the time of removal from Mother's home, G.F. initially exhibited behaviors that indicated he did not feel safe, was highly active and agitated, and did not seek caregivers for comfort. Montgomery's goal was to ensure that G.F. felt safe with the foster family and went to them for comfort and care. She stated that with therapy, and the foster family's application of intervention and strategies – both with her at the counseling sessions and on their own outside of the counseling environment – G.F. had improved, and his behaviors were decreasing. Montgomery also opined that, into the future, G.F. will continue to need "extensive supports" to be successful. *Id.* at 44.

[13] With PTSD, Montgomery confirmed that there had been some sort of past trauma, but due to G.F.'s young age, she did not know what that trauma was. In addition to PTSD and RAD, G.F. had been diagnosed with a heart

condition, which will require "doctor's care for the rest of his life," and require extra commitment from the caregivers. *Id.* at 51.

[14] Kristal Ranalli-Gramelspacher ("FCM Ranalli-Gramelspacher"), the DCS permanency worker who was responsible for overseeing S.S. and G.F.'s cases, also testified. Her role was to communicate with the parties, coordinate with and process information from service providers, and review documentation of parents' involvement with the criminal justice system. She observed that Father's most recent criminal offense occurred during the CHINS proceeding. She discussed Father having had prior substance and alcohol-related offenses, as well as offenses for battery, which she considered violent and caused her concern that Father would "engage again" in acts of violence. *Id.* at 96. FCM Ranalli-Gramelspacher also commented upon the commitment and work necessary to attend to G.F.'s RAD and PTSD diagnoses, as well as the heart condition and a recently-diagnosed genetic condition[5] that affects the body's connective tissues. She noted that G.F. regularly sees a cardiologist and is on high blood pressure medication. FCM Ranalli-Gramelspacher opined that, during the course of the proceedings, neither Mother nor Father had exhibited a level of commitment in terms of visitation and services as would be required to attend to G.F.'s ongoing special medical and developmental needs. *Id.* at 99.

---

[5] The transcript refers to the genetic condition as "Morphone's Syndrome," *tr.* at 97, although the reference was likely to Marfan Syndrome.

[15]     At the time of the termination hearing, S.S. and G.F. had been in their current foster home for approximately one year.  Both Children, when they first arrived, had trouble sleeping and struggled with attachment.  G.F. communicated with sounds rather than words, but after receiving speech therapy, improved to using words and sentences.  G.F. initially displayed defiant behaviors, kicking, screaming, and throwing objects, but the foster family had been consistently applying the therapeutic strategies to attend to G.F.'s avoidance of caregivers and frequent agitation, and G.F.'s behaviors had decreased.  G.F. also hoarded food at first, and "shovel[ed] food in his mouth so quickly that he would choke," which behaviors also improved.  *DCS Ex*. 3 at 32.  FCM Ranalli-Gramelspacher stated that the Children were bonded to the foster family, followed routines, and exhibited comfort there.  She also testified that the foster parents have shown commitment and effort to attend to G.F.'s emotional and physical special needs.

[16]     FCM testified that in her opinion Father would not be able to remedy the reasons for removal, noting that Father is incarcerated and that he committed his offense during the underlying CHINS case.  She also opined that Father's continued relationship with Children posed a threat to their well-being and that termination was in Children's best interests.  She testified that if the petition for termination was granted, the plan is adoption by the Children's foster parents.

[17]     Father also testified at the termination hearing.  He admitted to committing a burglary during the CHINS case.  Father's incarceration for that offense began on February 23, 2015, and his anticipated release date is in August 2017, less a

possible six months for good time credit. With regard to criminal history, Father admitted to a 2008 aggravated battery conviction, two separate battery convictions in 2011 or 2012, one of which was domestic battery, "three DUIs all within six months" in 2012 Edgar County, Illinois, and three retail thefts in 2014. *Id*. at 57-58. At the hearing, DCS also presented documentary evidence in support of those convictions, as well as convictions for resisting law enforcement, driving while suspended, and resisting a peace officer. *DCS Exs*. 17, 18, 20.

[18] Father described the extended family support he has in Paris, Illinois, and discussed his employment before being incarcerated. Father explained that he planned to take courses while in prison to obtain trade skills in the auto mechanics field. Father expressed that he does not feel he has "had a chance to even really get to know" S.S., and he asked the juvenile court not to terminate his parental rights to either G.F. or S.S. *Id*. at 128.

[19] With regard to services, HRC reports that were admitted into evidence indicated that Father "gained sober coping skills," "participated with a positive attitude," and had no positive results in drug and alcohol screens. *DCS Ex*. 13. Father completed treatment with HRC in January 2015. Father was also referred to Lifeline to receive services related to assisting Father with, among other things, obtaining employment, assisting with transportation, assisting him with parenting skills, and creating a budget. The Lifeline referral was put on hold, however, because Father was in Edgar County Jail. Sometime in February 2015, Lifeline staff met with Father at his home, discussing

improvements and repairs to his home to make it safe for children. Father was cooperative and took direction well. Lifeline reports indicate that Father "made significant improvements to his home" and was "calm, pleasant, and cooperative[.]" *DCS Ex*. 12. Lifeline services were terminated, however, due to Father's incarceration later in February 2015.

[20] At the termination hearing, Mother's counsel called Mother as a witness. She testified that Children are happy and healthy with their current foster family, that it is a stable and safe placement, and that she consents to adoption by the foster family. She explained, "They're happy where they're at and I'm not ready." *Tr.* at 112.

[21] On November 30, 2015, the juvenile court issued its order terminating the parent-child relationship between, as is relevant here, Father and both G.F. and S.S. The juvenile court found, among other things:

> 18. Father has a history of criminal activity, substance use, and instability. During the CHINS case, Father was in and out of jail. Father resided in Illinois. However, the conditions of the home were poor and never sufficiently improved to allow for placement of the children. Father obtained employment for approximately four (4) or five (5) months between periods of incarceration.
>
> . . . .
>
> 19. . . . Paternity was not established for [S.S.] until genetic testing was conducted during the CHINS case and Father has never had [S.S.] in his care.

. . . .

22. Father's visits with the [C]hildren were sporadic even when he was not incarcerated. Father did not attend any visits from May 13, 2014 until January of 2015. Father never established a bond with [S.S.] who cried throughout visits with Father. . . .

23. [G.F.] has developmental disabilities and a heart condition that will require lifetime medical care. [G.F.]'s heart condition requires medication and ongoing testing for eyesight and breathing issues. [G.F] has been diagnosed with Post Traumatic Stress Disorder ("PTSD") and Reactive Attachment Disorder ("RAD"). RAD is caused by pervasive neglect of basic physical needs and lack of comfort, stimulation, and interaction.

24. At the onset of the CHINS case, [G.F.] hoarded food and ate so fast that he would choke. [G.F.] began counseling to help control his behavior and deal with his issues. [G.F.] has progressed in therapy and these issues have improved in foster care. However, [G.F.] is likely to need extensive support to be successful in life and his physical and mental health issues will require vigilance and effort from his caregivers. [S.S.] does not have the same level of need.

25. The [C]hildren are thriving and making improvements while in foster care.

*Appellant's App.* at 21.

[22] The juvenile court concluded that there was a reasonable probability that the reasons for placement outside the home would not be remedied, the continuation of the parent-child relationship posed a threat to the well-being of

G.F. and S.S., and it was in the best interest of G.F. and S.S. to terminate the relationship. Father now appeals.

## Discussion and Decision

[23]    As our Supreme Court has recently reiterated, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive—so we review them with great deference to the trial courts[.]" *In re E.M.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise her child, and thus parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet her responsibility as a parent. *Bester v. Lake Cnty. Office of Family & Children,* 839 N.E.2d 143, 145 (Ind. 2005); *In re T.F.,* 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.* That is, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id.*

[24]    When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is

clearly erroneous. *Id*. at 148-49. A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

[25]     Here, in terminating Father's parental rights to Children, the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. A finding is clearly erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id*. If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[26]     Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B)  that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)  that termination is in the best interests of the child; and

(D)  that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).  The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'"  *In re H.L.*, 915 N.E.2d at 149.  Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship.  Ind. Code § 31-35-2-8(a) (emphasis added).

[27]  Father argues that DCS failed to prove the required elements for termination by sufficient evidence.  Specifically, he contends that DCS failed to present sufficient evidence that the conditions that resulted in Children being removed or the reasons for their placement outside the home would not be remedied.  Father also argues that DCS failed to present sufficient evidence that the continuation of the parent-child relationship posed a threat to Children's well-

being,[6] and he contends that DCS failed to prove that termination was in Children's best interest.

### *Remediation of Conditions*

[28] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's placement and retention in foster care, and, second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.,* 989 N.E.2d at 1231). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *A.F. v. Marion Cnty. Office of Family & Children,* 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied.* In addition,

---

[6] Father does not contend that DCS failed to prove that there was a satisfactory permanency plan in place for Children. Accordingly, he has waived any challenge to that element of the termination statute. Ind. Appellate Rule 46(A)(8)(a).

DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Kay L.,* 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *In re E.M.*, 4 N.E.3d at 643. Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that a parent's past behavior is the best predictor of their future behavior. *Id.*

[29] We note that, in claiming that the evidence was insufficient to support the juvenile court's order terminating his parental rights, Father does not challenge the sufficiency of the evidence to support any of the juvenile court's findings. As a result, Father has waived any argument relating to whether these unchallenged findings are clearly erroneous. *See In re B.R.,* 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (providing that failure to challenge findings resulted in waiver of argument that findings were clearly erroneous), *trans. denied.* We will therefore limit our review to whether these unchallenged findings are sufficient to support the juvenile court's conclusion that the conditions that led to the Children's removal from and continued placement outside Father's care would not be remedied.

[30] Here, in October 2013, DCS received a report that Mother left both S.S. and G.F., who was visiting Mother at the time, in an individual's care who was using Spice, and around that same time, S.S.'s hair follicle test returned as positive for methamphetamine. Although DCS did not remove Children at that

time, it directed Mother to seek medical attention for S.S., which she failed to do. In February 2014, again while G.F. was visiting Mother, Mother tested positive for Spice, and DCS removed Children from her care. By that time, the juvenile court already had warned Father to be vigilant in leaving G.F. in Mother's care. The Children were ultimately placed together with a foster family. Initially, G.F. exhibited defiant behaviors, and he did not use words or sentences to speak. Eventually, G.F. received assessments and was diagnosed with RAD, which results from prior pervasive lack of physical and emotional care, and PTSD, resulting from some prior trauma(s). Father suggests that "the evidence indicates that it was caused by Mother's neglect[.]" *Appellant's App.* 9. We acknowledge that, while visiting with Mother, Children were exposed to drugs and inadequate supervision; however, it is undisputed that Father was G.F.'s primary caregiver from in or around May 2012, when Mother and Father ended their relationship, until he was removed from Mother's care in February 2014. In addition to those mental health and developmental issues, G.F. has a heart condition and a genetic syndrome, which will require extra medical care for life.

[31] Although he was ordered to "obey the law," Father was arrested during the CHINS proceeding for burglary. *DCS Ex.* 1 at 55. As the trial court observed, Father had "a history of criminal activity, substance abuse, and instability." *Appellant's App.* at 21. He was convicted of at least ten criminal offenses since 2008, including those of a violent nature, such as battery and domestic battery, as well as some precipitated by substance abuse. He was incarcerated for the

burglary in February 2015, with his scheduled release date in August 2017, possibly shortened by, at most, six months. Although Father was sometimes employed, DCS remained concerned about his priorities and ability to handle a budget, as the water in his home was turned off for several months. DCS also noted that Father's inability to drive (due to repeated DUI convictions) affected his ability to get himself to work.

[32] Father had not ever had S.S. in his sole care, and he did not exercise visitation with Children at all from May 13, 2014 until January 9, 2015. A home study was completed of Father's home, but placement with him was not recommended due to the condition of his home, his criminal history, and instability. The conditions of Father's home were never improved enough to allow for placement of the Children there. Children were removed from Mother's care and never returned to either her care or Father's care during the course of the proceedings. Children's continued placement outside of Father's care was due, at least in part, to his continuing incarceration, which rendered him incapable of providing Children with food, clothing, shelter, and other basic life necessities. At the time of the April 2015 termination hearing, these conditions had not been remedied. FCM Ranalli-Gramelspacher testified that in her opinion there was not a reasonable probability that the problems that led to removal would be remedied.

[33] Father concedes that he made "the mistake of committing a burglary during this case," but urges that he also successfully completed substance abuse treatment, found a job, and had family support. *Appellant's Br.* at 8, 12. He maintains that

he has demonstrated the willingness and ability to improve his situation and "is prepared to care for his children when he is out of the Illinois Department of Correction in 2017." *Id*. However, as Indiana courts have recognized, "Individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *K.T.K.*, 989 N.E.2d at 1235-36; *C.T. v. Marion County DCS*, 896 N.E.2d 571, 585 (Ind. Ct. App. 2008), *trans. denied*. Furthermore, as we previously stated in another case involving an incarcerated parent, "[e]ven assuming that [father] will eventually develop into a suitable parent, we must ask how much longer [the child] should have to wait to enjoy the permanency that is essential to her development and overall well-being." *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 375 (Ind. Ct. App. 2006) (concluding that trial court did not commit clear error in finding conditions leading to child's removal from father would not be remedied where father, who had been incarcerated throughout CHINS and termination proceedings, was not expected to be released until after termination hearing), *trans. denied.*

[34] Based on the evidence presented, we cannot say that the juvenile court clearly erred in concluding that there is a reasonable probability that the conditions that resulted in Children's placement outside the home will not be remedied.

### *Threat to Well-Being*

[35] Father also contends that DCS failed to prove by clear and convincing evidence that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of Children. However, we need

not address such argument. Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S.*, 987 N.E.2d at 1156. Therefore, as we have already determined that sufficient evidence supported the conclusion that the conditions that resulted in the removal of Children would not be remedied, it is not necessary for us to address any argument as to whether sufficient evidence supported the conclusion that the continuation of the parent-child relationship posed a threat to the well-being of Children.

### *Best Interests*

[36] Father next argues that insufficient evidence was presented to prove that termination is in the best interests of the Children. In determining what is in the best interests of the child, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.,* 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*), *trans. dismissed.* In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id.* (citing *In re R.S.,* 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied).* The trial court need not wait until the child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for

permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests. *Id*. (citing *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)).

[37] Father asserts that he had a close bond with G.F., and because he did not know that S.S. was his daughter until well into the CHINS proceedings, he "never had a chance to bond with S.S.," but desires to. *Appellant's Br*. at 18. He maintains that, while he "still has work to do," his demonstrated work with Lifeline and HRC "has helped prepare him" to care for Children, arguing, "[I]t is not best for the [C]hildren to sever all ties to [Father.]" *Id*. at 19. Although we appreciate his desire, his argument presents a request for us to reweigh the evidence, which we cannot do. *In re H.L.*, 915 N.E.2d at 149.

[38] As discussed above, while G.F. was visiting with Mother in Indiana, DCS was notified that she had left the Children in the care of an individual who was using Spice. Shortly thereafter, S.S. tested positive for methamphetamine in her system, which Mother could not explain. Father was advised to be careful about leaving G.F. in her care, but on another occasion in February 2014, when G.F. was in Mother's care, she tested positive for Spice, and Children were removed. They were never returned to her care, or Father's. His home was found to be not suitable, and at times it was without water for several months. He did find employment for some months, but committed burglary during the CHINS proceedings and was incarcerated in February 2015. He did not exercise visitation with the Children from May 2014 to January 2015. Other

than some supervised visits with S.S., Father has not had her in his care.

[39] According to FCM Ranalli-Gramelspacher and Mother, Children are improving and thriving in the care of the foster family. They had routines and appeared comfortable there. Therapist Montgomery testified about the causes and effects of RAD and PTSD, and the necessary required ongoing treatment for those conditions. She observed that the foster family was committed and doing well in consistently implementing strategies and techniques to help G.F. feel safe with caregivers and go to them for comfort or care. Mother testified that Children "are happy where they're at" and that the foster family is a stable and safe placement. *Tr.* at 112. FCM Ranalli-Gramelspacher testified that she believed that termination of Father's parental rights was in the Children's best interest. Looking at the totality of the evidence, we conclude that sufficient evidence was presented to prove that termination was in the best interest of the Children.

[40] We will reverse a termination of parental rights only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997). Based on the record before us, we cannot say that the juvenile court's termination of Father's parental rights to Children was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

[41] Affirmed.

[42] Riley, J., and Pyle, J., concur.